## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA EX REL. PETER ROST,         )<br><br>Plaintiffs,     )<br><br>-v.-     )<br><br>PFIZER INC AND PHARMACIA CORPORATION,    )<br><br>Defendants.    ) | Docket Number: 1:03-CV-11084-PBS<br><br>The Honorable Patti B. Saris |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## <u>MOTION FOR SUMMARY JUDGMENT</u>

Ethan M. Posner
Geoffrey E. Hobart (BBO # 547499)
Benjamin J. Razi
Mark W. Mosier
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, D.C.  20004
(Tel) 202-662-6000
(Fax) 202-662-6291

*Attorneys for Pfizer Inc and
Pharmacia Corporation*

# TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ........................................................................................ 1

THE ALLEGED FALSE CLAIMS .................................................................................. 2

    A.     Rost's Claims Relate to Four Patients in Indiana and Kentucky. .......................... 2

    B.     Indiana and Kentucky Required Prior Authorization for Genotropin. ................... 3

    C.     Pharmacia Conduct Challenged by Rost ................................................................. 4

ARGUMENT ..................................................................................................................... 5

I.     The Summary Judgment Record Is Devoid of Any False Claims. ...................... 5

II.    The Genotropin Reimbursement Claims Are Not False. ...................................... 6

    A.     The Claims Are Not False Under Rost's "Off-Label" Theory. ............................. 7

         1.     The Claims Requiring Prior Authorization Are Not False Because
                the Government Pre-Approved the Particulars of Those Claims ............... 7

         2.     The Claims Are Not False Because They Were for Medically
                Accepted Indications ................................................................................. 9

    B.     The Claims Are Not False Under Rost's "Kickback" Theory ............................. 11

         1.     The Record Contains No Evidence of Certifications (Whether True
                or False) to Indiana or Kentucky Medicaid. .............................................. 12

         2.     Defendants Did Not Provide Kickbacks to the Prescribing
                Physicians. ................................................................................................ 13

              a)     Indiana Region Doctors Did Not Receive Kickbacks in
                  Connection with the KIGS Program. ............................................ 15

              b)     Indiana Region Doctors Did Not Receive Kickbacks in
                  Connection with the Bridge Program. ......................................... 16

              c)     Dr. Clark's Consulting Agreement Does Not Amount to a
                  Kickback. ..................................................................................... 17

III.    Defendants Did Not Cause the Submission of False Claims. ............................. 17

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

Page

CASES

Edmonds v. Levine,
   417 F. Supp. 2d 1323 (S.D. Fla. 2006) ....................................................................9

In re Pharm. Indus. Average Wholesale Price Litig.
   491 F. Supp. 2d 12 (D. Mass. 2007) .......................................................................12

Klaczak v. Consolidated Medical Transport,
   458 F. Supp. 2d 622 (N.D. Ill. 2006) .....................................................................14

Rost v. Pfizer, Inc,
   No. 05-cv-10384 (S.D.N.Y. Sept. 24, 2009).............................................................1

Shaw v. AAA Eng'g & Drafting, Inc.,
   213 F.3d 519 (10th Cir. 2000) .............................................................................8, 9

United States ex rel. Becker v. Westinghouse Savannah River Co.,
   305 F.3d 284 (4th Cir. 2002) ..................................................................................8

United States ex rel. Costner v. United States,
   317 F.3d 883 (8th Cir. 2003) ..................................................................................8

United States ex rel. Durcholz v. FKW, Inc.,
   189 F.3d 542 (7th Cir. 1999) ..............................................................................7, 9

United States ex rel. Franklin v. Parke-Davis,
   147 F. Supp. 2d 39 (D. Mass. 2001) ......................................................................9

United States ex rel. Franklin v. Parke-Davis,
   No. 96-11651-PBS, 2003 WL 22048255 (D. Mass. Aug. 22, 2003).........................7

United States ex rel. Hagood v. Sonoma County Water Agency,
   929 F.2d 1416 (9th Cir. 1991) ................................................................................8

United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,
   985 F.2d 1148 (2d Cir. 1993)..................................................................................8

United States ex rel. Loughren v. Unumprovident Corp.,
   No. 03-11699, 2008 WL 4280133 (D. Mass. Sept. 15, 2008)..................................5

United States ex rel. Perales v. St. Margaret's Hosp.,
   243 F. Supp. 2d 843 (C.D. Ill. 2003) ....................................................................14

*United States ex rel. Rost v. Pfizer Inc*,
    507 F.3d 720 (1st Cir. 2007)....................................................................5

*United States ex rel. Thomas v. Bailey*,
    No. 4:06CV00465, 2008 WL 4853630 (E.D. Ark. Nov. 6, 2008)...........................12

*United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*,
    874 F.2d 20 (1st Cir. 1989).............................................................13, 14

*United States v. MacKenzie*,
    No. 01-CR-10350-DPW (D. Mass. July 9, 2004)............................................13, 14

*United States v. McClatchey*,
    217 F.3d 823 (10th Cir. 2000) ...............................................................14

*United States v. Rogan*,
    459 F. Supp. 2d 692 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008) ...........................14

## STATUTES

42 U.S.C. § 1396r-8 ...................................................................9, 10

## OTHER AUTHORITIES

42 C.F.R. § 1001.952 ...................................................................17

1 John T. Boese, *Civil False Claims and Qui Tam Actions* (3d ed. 2006) ....................................8

Ky. Admin. Regs. 1:019 (2009)...........................................................4

OIG Advisory Op. 00-10 (2000)...........................................................16

## SUMMARY OF ARGUMENT

This is a False Claims Act ("FCA") case, involving the alleged off-label promotion of Genotropin, a human growth hormone drug manufactured and marketed by Defendants Pfizer Inc and Pharmacia Corporation.  As a result of this Court's Order dismissing most of the Relator's claims, Rost can now proceed only on his "allegations of false claims for off-label pediatric indications" in the "sales and marketing region that includes Indiana."  Mem. & Order, dated Sept. 18, 2008, at 16.  Rost alleges that Defendants somehow "caused" physicians to submit "false" claims to Medicaid by promoting Genotropin for unapproved pediatric indications and by paying the prescribing physicians unlawful financial "kickbacks." (Am. Compl. ¶ 56.)[1]  In its Order last year, the Court gave Rost one last chance to prove a false claim through discovery in the Indiana region.  Despite extensive discovery, Rost cannot produce evidence of a single false claim, much less evidence that Defendants "caused" these claims to be submitted to Medicaid agencies in Indiana, Kentucky, or anywhere else.

The discovery has revealed that the doctors did not even submit the claims—the pharmacies did—and there is no evidence that the pharmacies or doctors made any certifications, whether express or implied, at the time the claims were made.  Remarkably, Rost has not produced even one claim form for reimbursement of a Genotropin prescription.  Despite Rost's allegations of widespread off-label Genotropin promotion and use, the summary judgment record

---

[1]     Rost made similar allegations in a separate suit in which he sued Defendants for retaliation under the FCA and for wrongful termination.  *Rost v. Pfizer, Inc*, No. 05-cv-10384 (S.D.N.Y.).  In that case, Rost alleged that he was not offered a position at Pfizer because he "voiced concerns over Pharmacia's drug marketing practices."  Mem. & Order, dated Sept. 24, 2009, at 1.  Last week, the court granted summary judgment for Defendants on all claims, including Rost's FCA retaliation claim.  *Id.*

contains no evidence of off-label promotion in the Indiana region and <u>only four patients</u> in

Indiana or Kentucky who had claims reimbursed by Medicaid for an off-label indication.  Three

of these patients suffered from Turner Syndrome, for which the FDA approved an identical

growth hormone product as early as 1997; and the fourth patient was prescribed Genotropin for

Idiopathic Short Stature ("ISS").  Virtually all of the prescriptions for these four patients were

subject to "prior authorization" review by the Indiana and Kentucky Medicaid agencies.[2]  This

prior authorization, standing alone, negates the intent necessary for FCA liability to attach.

Mem. & Order at 14.  Moreover, representatives from the state Medicaid agencies testified that

they are unaware of any false or improper Genotropin claims.

In short, there is no evidence that any Genotropin claims submitted to the

government were <u>false</u> in any respect, or that Pfizer or Pharmacia <u>caused</u> any <u>false</u> claims to be

submitted.  The Court should therefore grant summary judgment for Defendants and end this

FCA case, in which DOJ declined to intervene years ago.

## <u>THE ALLEGED FALSE CLAIMS</u>

### A.   Rost's Claims Relate to Four Patients in Indiana and Kentucky.

In his Amended Complaint, Rost alleged that 17 patients had Genotropin claims

improperly reimbursed by Indiana Medicaid.  (Am. Compl., Ex. A.).  Now, with discovery

complete, he asserts that false claims were submitted for only six of the original 17 Indiana

patients.  (Defs.' Statement of Undisputed Facts ("SUF") ¶ 28.)  Like his original assertion,

Rost's revised allegations are incorrect because four of the remaining six patients were

---

[2]      Each patient was prescribed Genotropin on multiple occasions, and therefore had
multiple claims for reimbursement submitted to Medicaid.  For three of the patients, every claim
required prior authorization.  For the fourth patient, all but three claims required prior approval.

prescribed Genotropin for on-label indications.  (*Id.* ¶ 30.)  Thus, undisputed evidence establishes that only <u>two</u> of the Indiana patients received Genotropin for off-label uses. (*Id.* ¶ 31.)

Recognizing the fatal flaws in his Indiana proof, Rost also sought discovery from Kentucky Medicaid.  But the Kentucky evidence does not help Rost.  Rost has identified 66 patients whom he alleges had claims improperly reimbursed by Kentucky Medicaid (*id.* ¶ 39), but the diagnostic codes contained in the Kentucky Medicaid records establish that only <u>two</u> patients had off-label diagnoses.  (*Id.* ¶¶ 41-42.)

In sum, the claims of only four patients in Indiana and Kentucky were even arguably off-label.[3]  Three of the four patients suffered from Turner Syndrome, which has long been approved by FDA for products that are chemically equivalent to Genotropin.  Only one patient was prescribed Genotropin for ISS, and each of the claims for this patient was pre-approved by Indiana Medicaid.

**B.     Indiana and Kentucky Required Prior Authorization for Genotropin.**

Under the prior authorization procedures in Indiana and Kentucky, the state Medicaid agencies would provide reimbursement for a prescription of Genotropin only if the agency had authorized growth hormone treatment for the patient before the prescription was

---

[3]     Information about the relevant patients is set forth in the chart below:

| Patient | State | Physician | Diagnosis | Medicaid Payment Dates |
|---------|-------|-----------|-----------|------------------------|
| S.B. | IN | DiMeglio | Turner Syndrome | Oct. 2001 – Jun. 2003 |
| C.S. | IN | Wright/Eugster | Idiopathic Short Stature | Aug. 2002 – Jan. 2004 |
| C.B. | KY | Clark | Turner Syndrome | Nov. 1999 – Dec. 2003 |
| R.V. | KY | Clark | Turner Syndrome | Jun. 2000 – Dec. 2003 |

written.  The overwhelming majority of the claims paid on behalf of the four Indiana and

Kentucky patients at issue in this case required prior authorization from the Medicaid agencies.

Beginning on January 7, 2002, Indiana required prior authorization for

prescriptions of Genotropin.  (SUF ¶ 18.)  Indiana's prior authorization request form required the

physician to provide the patient's diagnosis (including an ICD-9 code) and a "clinical summary."

(*Id.* ¶ 19.)  The "clinical summary" required the physician to attach "[a] current plan of treatment

and progress notes as to the necessity, effectiveness and goals of treatment."  (*Id.*)

Kentucky has had prior authorization procedures since 1976.  (*Id.* ¶ 20.)  When

Genotropin was approved in 1995, Kentucky law required the state Medicaid agency to place

every new drug approved by FDA on the "prior authorization" list.  (*Id.* ¶¶ 20-23.)  Prior

authorization procedures remained in effect throughout the relevant time period and are still in

effect today.  *See, e.g.,* 907 Ky. Admin. Regs. 1:019 (2009).  Kentucky's prior authorization

form required (among other information) the patient's "diagnosis and prognosis."  (SUF ¶ 24.)

Presumably because the overwhelming majority of the prescriptions at issue were

pre-approved by Indiana and Kentucky Medicaid, neither agency agrees with Rost that the

claims were false.  During discovery, the Indiana and Kentucky representatives testified that they

have no reason to believe that any of the claims at issue in this case are false.  (*Id.* ¶¶ 29, 40.)

C.     **Pharmacia Conduct Challenged by Rost**

Rost's case is based on allegations of widespread off-label promotion of

Genotropin, but there is no evidence of any such conduct by Pharmacia in the Indiana region.

The sales representative responsible for this territory -- Martha Simoncini -- testified

unequivocally that she only promoted for on-label indications, and there are no documents or

other evidence contradicting her testimony.  (SUF ¶ 52 ("You promote for the indications in the

package insert, and that's all I ever did."))  Similarly, the doctors in the Indiana region confirmed

that Genotropin was not promoted off-label to them.  (*See e.g.*, SUF ¶ 53 ("Q.  Did [Ms.

Simoncini] do anything in those meetings that you considered inappropriate?  A.  No. . . .

Q.  [D]id Ms. Simoncini discuss off-label uses of Genotropin?  A.  Never.  Q.  [D]uring any of

your meetings with her?  A.  . . . Never. . . .  She did not.  Q.  Did you discuss with anyone from

Pharmacia off-label uses of Genotropin during any part of the time period 1999 to 2003? . . .

A.  I did not.); *see also* SUF ¶¶ 54-55.)

Rost also contends that Defendants caused four Indiana region doctors to

prescribe Genotropin to the patients at issue in this case by providing "kickbacks."  According to

Rost, these physicians received kickbacks by participating in Pharmacia research and support

programs—in particular, the KIGS and Bridge programs.  The KIGS program is an ongoing,

open-label, data surveillance study that surveys children taking Genotropin.  (*Id.* ¶ 56.)  The

primary objective of KIGS is to collect information on the long-term safety and growth response

to Genotropin.  (*Id.* ¶ 57.)  The Bridge program is a reimbursement program that better connects

patients, providers, and payors.  (*Id.* ¶ 71.)  The Bridge program was developed, among other

reasons, to assist physicians by coordinating the collection and submission of medically

necessary documentation to insurance companies.  (*Id.* ¶ 72.)  The KIGS and Bridge programs

serve legitimate, beneficial purposes.  (*Id.* ¶¶ 58, 71.)  Other growth hormone manufacturers

offer similar programs.  (*Id.* ¶¶ 61, 74.)

## ARGUMENT

## I.    THE SUMMARY JUDGMENT RECORD IS DEVOID OF ANY FALSE CLAIMS.

"Evidence of an actual false claim is the *sine qua non* of a False Claims Act

violation."  *United States ex rel. Rost v. Pfizer Inc*, 507 F.3d 720, 727 (1st Cir. 2007) (quotations

and citations omitted); *see also United States ex rel. Loughren v. Unumprovident Corp.*, No. 03-

11699, 2008 WL 4280133, *2 (D. Mass. Sept. 15, 2008) (Saris, J.) ("Liability under the FCA requires a false claim."). Even though the Court afforded Rost extensive discovery in the Indiana region, he has proffered no evidence of any false claim. Contrary to Rost's allegations about the doctors submitting the claims, it was in fact the pharmacies who did so. Rost has not even come forward with a single actual claim form, much less the alleged falsity in these claim forms. Rost obtained access to spreadsheets with basic claims data from the Medicaid agencies in both Indiana and Kentucky, but he failed even to obtain the claim forms and other paperwork behind the basic claims data. (SUF ¶¶ 27, 39.) Although the spreadsheet may be sufficient to show that claims were paid, they do nothing to establish the falsity of those claims because they provide no evidence of the contents of the claims.

Because Rost has no evidence of the actual claims submitted for reimbursement, he cannot demonstrate what representations were made in order to get those claims paid. As a result, there is no evidence of the representations made to get the claims paid, and therefore no basis on which a jury could find that false statements were made. For this reason alone, summary judgment should be entered.

## II.     THE GENOTROPIN REIMBURSEMENT CLAIMS ARE NOT FALSE.

Even if Rost could proffer the claim forms on which his case is based, summary judgment would be required because the undisputed factual record includes no false statements—whether express or implied—by the pharmacies who sought reimbursement for Genotropin prescriptions or the doctors who wrote the prescriptions. Only four patients in the summary judgment record—two in Indiana and two in Kentucky—had claims reimbursed for indications that are even arguably off-label. Rost has two different theories for how these claims are false; the evidence does not support either of them.

### A.     The Claims Are Not False Under Rost's "Off-Label" Theory.

Under Rost's "off-label" theory, the off-label claims for Genotropin are false based solely on the fact that the prescriptions were for off-label indications. Even if a claim could be false in other circumstances if it were submitted for an "off-label, non-compendium use," *United States ex rel. Franklin v. Parke-Davis*, 2003 WL 22048255, at *4 (D. Mass. Aug. 22, 2003), the Indiana region claims at issue in this case cannot be false for several reasons unique to these particular circumstances. <u>First</u>, virtually all of the claims required prior authorization before the states would pay them. Because the states approved of these claims before they were submitted, the claims cannot violate the FCA. <u>Second</u>, unlike the "off-label, non-compendium use" at issue in *Franklin*, the off-label uses in this case are supported by citations in the statutorily-recognized compendia.

### 1.     The Claims Requiring Prior Authorization Are Not False Because the Government Pre-Approved the Particulars of Those Claims.

Genotropin claims are not false, even for an off-label use, if the government knew the diagnosis for which the prescription was written. As the Seventh Circuit has explained: "If the Government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim. In such a case, the government's knowledge effectively negates the fraud or falsity required by the FCA." *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 545 (7th Cir. 1999). In its previous Order, this Court recognized that a claim would not be false if it were submitted after the government had approved a prior authorization request for that prescription:

> Defendants have a compelling position that state approval undermines the assertion of a "false claim." Thus, for example, <u>if a state knowingly chose to reimburse for a drug, even for an off-label use, after a prior authorization review, liability would not attach because extensive government knowledge would "negate the intent requirement under the FCA as a matter of law."</u>

Mem. & Order at 14 (quoting *Shaw v. AAA Eng'g & Drafting, Inc.,* 213 F.3d 519, 534 (10th Cir. 2000)) (emphasis added).[4]

Both Indiana and Kentucky require prior authorization for Genotropin prescriptions. Indiana began requiring prior authorization on January 7, 2002, and Kentucky required prior authorization during the entire period. (SUF ¶ 16.) As a result, none of the Indiana claims paid after January 7, 2002 or any of the Kentucky claims can possibly be false under Rost's "off-label" theory.

The claims submitted for the only patient who received Genotropin for ISS required prior authorization and therefore are not false. Indiana's prior authorization form required the physician to provide, among other information, a diagnosis (including ICD-9 diagnostic code) and clinical summary for the patient. (*Id.* ¶ 19.) On the relevant Statement of Medical Necessity ("SMN"), the physician checked the box for "other" diagnosis and wrote in 783.41—the diagnostic code for "Failure to Thrive." (*Id.* ¶ 36.) The SMN also accurately reports the results of the stimulation tests and the physician's handwritten note states: "very slow growth velocity." (*Id.*) This information provided Indiana Medicaid with the particulars of the claims, and therefore approval of the prior authorization requests "'negate the intent requirement under the FCA as a matter of law.'" Mem. & Order at 14 (quoting *Shaw,* 213 F.3d at 534).

---

[4]     In addition to *Shaw,* many other decisions also support this Court's view. *See, e.g., United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002); *United States ex rel. Durcholz v. FKW, Inc.*, 189 F.3d 542, 543 (7th Cir. 1999); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1156–57 (2d Cir. 1993); *United States ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991); *see also* 1 John T. Boese, *Civil False Claims and Qui Tam Actions* § 2.06[E] (3d ed. 2006).

All but three of the claims for Turner Syndrome patients required prior authorization and therefore were not false.[5] The prior authorization forms used in Indiana and Kentucky required the physician to provide, among other information, a diagnosis (including an ICD-9 diagnostic code). (SUF ¶¶ 19.) The SMNs for each of these patients clearly showed that Genotropin was being prescribed for Turner Syndrome. (*Id.* ¶¶ 32, 42.) This information provided Indiana and Kentucky Medicaid with the particulars of the claims, and therefore approval of the prior authorization requests "'negate[s] the intent requirement under the FCA as a matter of law.'" Mem. & Order at 14 (quoting *Shaw,* 213 F.3d at 534).

Because Indiana and Kentucky Medicaid knew the patients' diagnoses when they approved the prior authorization requests, the subsequent claims for reimbursement for off-label indications did not violate the FCA. *See, e.g., Durcholz,* 189 F.3d at 545.

### 2. The Claims Are Not False Because They Were for Medically Accepted Indications.

Genotropin claims are not false, even for an off-label use, if the prescription is for a "medically accepted indication." Mem. & Order at 5 (discussing 42 U.S.C. § 1396r-8(d)(1)(B)(i)); *see also United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 45 (D. Mass. 2001). Subject to exceptions not relevant here, federal law directs States to provide coverage for any "medically accepted indication" of certain prescription drugs. 42 U.S.C. § 1396r-8. The term "medically accepted indication" includes both FDA-approved uses and off-label uses that are "supported by one or more citations included" in DRUGDEX or another statutorily-recognized compendia. 42 U.S.C. § 1396r-8(k)(6); *see also Edmonds v. Levine*, 417

---

[5] The Indiana patient with Turner Syndrome had claims paid between October 9, 2001 and June 17, 2003. (SUF ¶ 34.) The first three claims did not require prior authorization because they were paid before January 7, 2002, but the remaining claims all required prior authorization.

F. Supp. 2d 1323 (S.D. Fla. 2006).  As a result, Indiana and Kentucky Medicaid properly paid claims for all medically accepted indications of Genotropin.

Rost incorrectly contends that claims submitted for patients with Turner Syndrome were false.  Rost's assertion fails because Turner Syndrome—which is now an FDA-approved indication for Genotropin (SUF ¶ 9)—was a medically accepted indication during the relevant time period.  Although Genotropin did not receive FDA approval for Turner Syndrome until April 2006, other somatropin products were approved to treat short stature associated with this illness as early as March 1997.  (*Id.*)  As a result, the congressionally approved compendia have long supported the use of somatropin for Turner Syndrome.[6]  In 2000, the DRUGDEX compendium stated that Turner Syndrome was an "FDA Labeled Indication" and that it was "effective" for the pediatric population.  (*Id.* ¶ 10.)  DRUGDEX contained citations to four studies that support the use of somatropin for Turner Syndrome and noted that "[a] growing body of clinical research consistently documents that Turner's Syndrome patients respond favorably to treatment with exogenous growth hormone."  (*Id.*)  As a result, during the relevant time period, Turner Syndrome was "supported by one or more citations" in DRUGDEX and therefore was a medically accepted indication of Genotropin.  42 U.S.C. § 1396r-8(k)(6).

Likewise, Rost incorrectly contends that claims submitted for the single patient with ISS were false.  ISS—which is now an FDA-approved indication for Genotropin (SUF ¶ 11)—was a "medically accepted indication" during the relevant time period.  In its previous Order, the Court concluded that "[t]he preliminary record is insufficient to determine whether the

---

[6]     Because the Amended Complaint did not identify any patients that purportedly had claims paid for Turner Syndrome, DRUGDEX's treatment of Turner Syndrome was not addressed in the parties' briefing or the Court's Order on the motion to dismiss.

citations included in DRUGDEX discussing 'short stature' can be read to 'support' its off-label use." Mem. & Order at 13.  The record is now clear—based on the compendia citations and the unrebutted testimony of Defendants' expert—that ISS was supported by "one or more citations" in DRUGDEX.  Dr. Lynne J. Levitsky, the head pediatric endocrinologist at Massachusetts General Hospital, has testified that:

> Even before the FDA approved somatropin for Idiopathic Short Stature in 2003, numerous studies supported the use of rhGH for treatment of this condition.  In one well-known study, 92 subjects at ten locations were given rhGH for 36 months.  The results of this study were published in 1993 in the *Journal of Pediatrics* (a well-respected, peer-reviewed journal).  The article concluded that "[s]hort-term administration of human growth hormone to children with idiopathic short stature can improve mean growth rate and predicted adult height."

(SUF ¶ 11.)  Because the article published in the *Journal of Pediatrics* supports the use of somatropin for ISS and is cited in DRUGDEX (*Id.* ¶ 13), ISS was a "medically accepted indication" (*i.e.*, it was "supported by one or more citations included" in DRUGDEX) during the time period relevant to Rost's allegations.  Indiana Medicaid therefore properly, and knowingly, reimbursed claims for ISS.

**B.     The Claims Are Not False Under Rost's "Kickback" Theory.**

Under Rost's "kickback" theory, the off-label claims are false because the claimant has falsely certified compliance with all Medicaid regulations, including the Anti-Kickback Statute.  Rost has no evidence that any treating physician or pharmacist in the Indiana region <u>expressly</u> certified compliance with the Anti-Kickback Statute.  To the extent Rost relies on an "implied certification" theory, *see In re Pharm. Indus. Average Wholesale Price Litig.* ("*In*

*re AWP*"), 491 F. Supp. 2d 12, 18 (D. Mass. 2007),[7] Rost's claims must fail because (1) the prescribing physicians did not submit claims and therefore did not certify compliance—expressly or impliedly—with Medicaid regulations; and (2) the prescribing physicians received no kickbacks.

> **1.  The Record Contains No Evidence of Certifications (Whether True or False) to Indiana or Kentucky Medicaid.**

Rost has no evidence to establish that anyone—pharmacies or physicians—certified compliance with the Anti-Kickback Statute.  The claims at issue here were submitted by pharmacies, not prescribing physicians.  (SUF ¶¶ 27, 39.)  Because Rost has not obtained those claims, he cannot identify what certifications were made, much less whether or how they were false.  Nor has he identified any certifications, whether implicit or explicit, made by the doctors to the pharmacies, much less those made by the pharmacies to the state Medicaid agencies.  Under these circumstances, there is no evidence on which a jury could conclude that the pharmacies submitted false claims by falsely certifying compliance with Medicaid regulations.

Nor can Rost somehow argue that a physician's alleged acceptance of kickbacks was sufficient to render false all Medicaid claims <u>submitted by others</u> in connection with his work.  *See United States ex rel. Thomas v. Bailey*, 2008 WL 4853630, at *13 (E.D. Ark. 2008) (dismissing FCA claims against hospitals because "the hospitals impliedly certified that they were in compliance with the Anti-Kickback Statute; <u>but they did not impliedly or expressly certify that the physicians who attended patients in their hospital complied with that statute</u>.").

---

[7]  Regardless of its validity in other contexts, the "implied certification" theory should not apply to reimbursement claims submitted to Medicaid agencies because Medicaid, unlike Medicare, does not require affirmative certification of compliance with anti-kickback laws. Although this Court held in *In re AWP* that the "implied certification" theory applies to Medicaid claims, Defendants raise the issue here to preserve it for appeal.

*Id.* (emphasis added).  The *Thomas* court's reasoning applies with equal force here.  The pharmacies may have certified that they complied with the Anti-Kickback Statute (even though there is no record evidence of any such certifications), but they did not certify that the prescribing physicians had also complied.

### 2. Defendants Did Not Provide Kickbacks to the Prescribing Physicians.

Rost's "kickback" theory requires him to prove that the prescriptions for the four patients at issue in this case were written by physicians who had received kickbacks.  The prescriptions for the four patients at issue were written by Dr. James Wright, Dr. Linda DiMeglio, Dr. Erica Eugster, and Dr. Pamela Clark.  Although each of these physicians was a KIGS Investigator (for which their Universities received compensation), only Dr. Clark provided consulting services to Defendants and therefore received payments from them.  (SUF ¶ 75.)  This evidence is insufficient to prove that any of these physicians received kickbacks.

To prove that one of these prescribing physicians received a kickback, Rost must show, among other things, that Defendants provided remuneration in excess of fair market value and with the improper intent to "induce" the physician to prescribe Genotropin.  *See United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 29, 33 (1st Cir. 1989).  Juries in this district have been instructed that "[t]he statutory requirement of improper inducement is satisfied only if remuneration . . . is offered or paid as a *quid pro quo* for the specific purchase of the drug."  *United States v. MacKenzie*, Cr. No. 01-CR-10350-DPW  (D. Mass.) (Woodlock, J.), Tr. of Proceedings at 54 (July 9, 2004) ("*MacKenzie* Tr.") (emphasis added); *see also id.* ("It's not the purpose or within the scope of the anti-kickback statute to prohibit transactions that reflect the mere hope or expectation or belief that drug purchases might ultimately ensue from the business relationship.").  Indeed, "[a] person does not violate the Anti-Kickback Statute by providing remuneration or other benefits solely as part of the routine

cultivation of a business relationship rather than with the intent to induce specific purchases."
*United States v. Bruens,* No. 05-CR-10102-JLT (D. Mass.) (Tauro, J.), Tr. of Proceedings at 73
(May 2, 2007); *see also MacKenzie* Tr. at 54-55 ("Cultivating a business relationship is not
improper.  A person does not violate the Anti-Kickback Statute by providing things of value
solely as part of a routine cultivation of a business relationship rather than with the intent to
induce specific purposes.").[8]

        In these particular circumstances, Rost's claims with respect to the few
prescribing physicians in the Indiana region must fail because he has no evidence on which a
jury could conclude that any remuneration received by these physicians did not represent the fair
market value of their services.  *See Bay State*, 874 F.2d at 29 ("The trial court did not err in not
specifically instructing the jury that the government had to prove that the payments received
were not reasonable for the actual work done.").  Courts have held that defendants are entitled to
summary judgment when—as here—a relator fails to present sufficient evidence to determine the
fair market value of the services provided.  *See Klaczak v. Consolidated Medical Transport*, 458
F. Supp. 2d 622, 679 (N.D. Ill. 2006) (granting summary judgment because "Relators have no
admissible evidence to offer at trial with respect to fair market value"); *United States ex rel.
Perales v. St. Margaret's Hosp.*, 243 F. Supp. 2d 843, 851-52 (C.D. Ill. 2003) (granting summary

---

[8]        These jury instructions are consistent with the law in other circuits.  *See, e.g., United
States v. McClatchey*, 217 F.3d 823, 834 (10th Cir. 2000) ("To offer or pay remuneration to
induce referrals means to offer or pay remuneration with the intent to gain influence over the
reason or judgment of a person making referral decisions"); *United States v. Rogan*, 459 F. Supp.
2d 692, 714 (N.D. Ill. 2006) ("[A] hope, expectation or belief that referrals may ensue from
remuneration for legitimate services is not a violation of the Anti-Kickback Statute."), *aff'd*, 517
F.3d 449 (7th Cir. 2008).

judgment because relator "failed to demonstrate what the fair market value of the practices in question was, much less that there were any amounts paid in excess of the fair market value").

<strong>a)      Indiana Region Doctors Did Not Receive Kickbacks in Connection with the KIGS Program.</strong>

The prescribing physicians did not receive kickbacks based on their participation in the KIGS program.  Rost alleges that the program was merely a marketing tool to reward physicians for prescribing Genotropin (Am. Compl. ¶ 66), but the evidence establishes that the program had substantial clinical benefits.  (SUF ¶¶ 59-60.)  The data collected through KIGS has been used by FDA and researchers, and over 70 articles published in scientific journals have used KIGS data.  (*Id.* ¶ 60.)  To compensate for the time spent entering patient information into the database, Pharmacia paid $100 per patient per entry (with a maximum of $200 per patient per year).  (*Id.* ¶ 67.)  Rost alleges that these payments were kickbacks to physicians, but the evidence shows that the payments went to <u>institutions</u>—Indiana University and University of Louisville for the claims relevant here—not to physicians.  (*Id.* ¶ 65.)  The Indiana region physicians therefore did not receive remuneration for data entry into KIGS.  In any event, these payments represent the fair market value of the time spent entering the data by these particular doctors, and Rost has no evidence to suggest otherwise.

Rost also incorrectly contends that Drs. Eugster, DiMeglio, and Clark received kickbacks by attending KIGS meetings held in desirable locations.  The Indiana region doctors have testified that the KIGS meetings were for medical and educational purposes and did not influence their prescriptions.  (SUF ¶ 77 ("I don't think that there was any marketing effort that impacted me or my colleagues at Indiana University.  We prescribed growth hormone on the basis of our best clinical judgment, and. . . our prescribing habits had nothing to do with . . . the KIGS symposia."); *see also id.* ¶ 78.)  As Dr. Levitsky explained, these meetings "provided

substantial educational benefits to pediatric endocrine physician attendees by bringing them up-to-date on the newest findings in regard to growth disorders and effects and side effects of growth hormone. . . .   These meetings often presented information before it was in the written literature." (*Id.* ¶ 60.)  Rost alleges that the meetings were intended to induce physicians to prescribe more Genotropin, but this contention is also unsupported by the evidence.

Most significantly, the KIGS Program payments at issue here were made to <u>universities</u>, not physicians.  (*Id.* ¶ 65.)  Almost every top medical school in the country takes part in the study, including Boston University, Boston Children's hospital, Yale University, Stanford University, Columbia University, Johns Hopkins University, Duke University, and Northwestern University.  (*Id.* ¶ 64.)  If Rost's outlandish theory is endorsed by the Court, these universities have violated (and continue to violate) federal law.

### b) Indiana Region Doctors Did Not Receive Kickbacks in Connection with the Bridge Program.

Rost also argues that the Bridge program provided kickbacks to physicians, but this is inconsistent with the evidence and longstanding guidance from the federal government. The Bridge program provided reimbursement assistance to patients and physicians.  (*Id.* ¶ 71.)  If the physician used the Bridge program, the physician would fax the patient's SMN to the Bridge program, and the Bridge program would determine the insurance requirements and seek prior authorization (if necessary) before sending the prescription to the pharmacy.  (*Id.* ¶¶ 71-72.) This assistance does not provide the physician with any remuneration of significant independent value and consequently cannot amount to a kickback.  *See* OIG Advisory Op. 00-10, at 7 (2000) ("Drug manufacturers often offer free assistance to physicians and other providers by serving as a clearinghouse for information regarding insurance coverage criteria and reimbursement levels for their products.  Since these services have no independent value to providers apart from the

products, they are properly considered part of the products purchased . . . .  Therefore, standing alone, these services have no substantial independent value and do not implicate the Federal anti-kickback statute.") (emphasis added).

        **c)**       **Dr. Clark's Consulting Agreement Does Not Amount to a Kickback.**

Although Rost complains about Pharmacia's consulting agreements with doctors, in fact, there is no evidence in the record that any Indiana physician was a party to such an agreement.  And, Rost cannot establish that the consulting agreement between Dr. Clark and Pharmacia could give rise to kickback liability.  The evidence shows that Dr. Clark, the physician who prescribed the Kentucky claims, was paid to speak to other physicians about Genotropin.  (SUF ¶ 75.)  As discussed above, Rost has no evidence to show that these payments exceeded the fair market value for the bona fide services that she provided.  Nor is there any evidence that these payments were made to induce Dr. Clark to prescribe Genotropin to more patients.  Moreover, Pharmacia's consulting agreements were in writing, signed by the parties, provided a description of the services rendered, the schedule for the services, the term of the agreement (one year or greater), and the total compensation to be paid.  (*Id.* ¶ 76.)  Under these circumstances, the agreement with Dr. Clark does not violate the Anti-Kickback Statute.  42 C.F.R. § 1001.952(d).

**III.  DEFENDANTS DID NOT CAUSE THE SUBMISSION OF FALSE CLAIMS.**

Even if Rost could prove that the pharmacies filed false claims (which he cannot), he cannot prevail unless he can also establish that Defendants caused the submission of these claims.  *See, e.g., Franklin*, 2003 WL 22048255, at *4 ("The text of [the FCA] requires a causal connection between [defendant's] actions and the false claims at issue.").  In permitting Rost to proceed on his off-label pediatric claims, this Court explained:  "To prevail, Plaintiff will have to

demonstrate that the financial incentives were unlawful kickbacks <u>which foreseeably caused</u> the submission of a false claim for federal reimbursement under the FCA."  Mem. & Order at 14 (emphasis added).  To prove causation, Rost must establish, at a minimum, that Defendants' actions were a "substantial factor" in the submission of a false claim.  *Franklin*, 2003 WL 22048255, at *5.

The evidence in this case negates any causal relationship between Pharmacia's conduct and any improper prescriptions.  <u>First</u>, there is no evidence that KIGS or the other practices Rost complains of actually increased the number of growth hormone prescriptions.  <u>Second</u>, the doctors themselves testified that Defendants did not affect their prescribing decisions.  (SUF ¶¶ 77-78.)  <u>Third</u>, Defendants' expert, Dr. Levitsky, reviewed the available patient files and did not find any patients who were prescribed Genotropin who would not benefit from growth hormone therapy.  (*Id.* ¶ 79.)  Rost has nothing to rebut this testimony.  Nor is there any evidence that any remuneration increased the number of Genotropin prescriptions by causing a physician to prescribe Genotropin instead of one of its competitors.  As discussed below, the relevant physicians adopted prescribing practices that prevented improper influence from manufacturers.

Any remuneration provided to Drs. Wright, DiMeglio, and Eugster—the prescribing physicians in Indiana—did not cause them to prescribe Genotropin.  These physicians all worked at Riley Hospital for Children.  (SUF ¶ 80.)  This hospital used a "rotation system" which resulted in patients being prescribed Genotropin (or one of its competitors) on a random basis.  (*Id.*)  Under a rotation system, patients are evenly divided between each of the competing growth hormone products, unless the patient or insurer expresses a preference for a particular brand of growth hormone.  (*Id.*)  As a result, Drs. Wright, DiMeglio, and Eugster did

not choose to prescribe Genotropin (as opposed to a competitor's product) to the patients at issue in this case.  Thus, any remuneration provided to these physicians was not a "substantial factor" in the decision to prescribe Genotropin.  Accordingly, Defendants could not have caused the submission of the claim for reimbursement.  *See Franklin*, 2003 WL 22048255, at *5.

Similarly, the remuneration provided to Dr. Clark—the prescribing physician in Kentucky—did not cause her to prescribe Genotropin.  Dr. Clark allowed patients and their families to decide which brand of growth hormone they preferred.  (*Id.*)  According to Defendants' expert, Dr. Levitsky, "Dr. Clark's prescribing patterns are consistent with a 'patient choice' approach."  (*Id.*)  Because Dr. Clark did not decide whether a patient would receive Genotropin or one of its competitors, any alleged remuneration that she received was not a "substantial factor" in the decision to prescribe Genotropin and did not cause the submission of the reimbursement claim.  *See Franklin*, 2003 WL 22048255, at *5.

Rost's own expert witness admitted that he has not and could not determine that any particular prescription or claim was caused by the KIGS Program, the Bridge Program, or Dr. Clark's consulting agreement.  (SUF ¶ 83 ("Q. [W]hich claims did the KIGS program cause to be submitted?  A.  I don't have a basis for determining that."); *id.* ¶ 82 ("Q. [J]ust so it's absolutely clear, you don't know which claims were, if any, were caused by the Bridge Program.  A.  That's correct.  Q. [Y]ou can't tell me which claims were partially caused by the Bridge Program?  A.  No.").)  Under these circumstances, a jury would have no way to determine which, if any, prescriptions were "caused" by the Defendants' actions.[9]

---

[9]     Rost's allegations relate to the sales and marketing of Genotropin by Pharmacia.  The Amended Complaint makes clear that Pfizer was named as a Defendant based on its acquisition of Pharmacia.  *See* Am. Compl. ¶ 12.  There are no allegations, and no evidence, that Pfizer (continued…)

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted.

Respectfully submitted,

_/s/ Ethan M. Posner_
Ethan M. Posner
Geoffrey E. Hobart (BBO # 547499)
Benjamin J. Razi
Mark W. Mosier
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, D.C.  20004
(Tel) 202-662-6000

October 1, 2009                              *Attorneys for Pfizer Inc and Pharmacia Corporation*

---

engaged in wrongdoing, and therefore Rost's claims should be limited to the period during which Pharmacia marketed Genotropin.  Accordingly, at the very least, Defendants are entitled to summary judgment on any claims paid after April 16, 2003—the date on which Pfizer completed its acquisition of Pharmacia.